IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

         v.                            15-CR-143-V

JOSE RUBEN GIL,
HERMAN E. AGUIRRE,
TROY R. GILLON,
DEMETRIUS YARBOROUGH, and
RASHAWN CRULE,

              Defendants.

_____

## GOVERNMENT'S PRETRIAL MEMORANDUM

THE UNITED STATES OF AMERICA, by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and Meghan A. Tokash and Michael P. Felicetta, Assistant United States Attorneys for the Western District of New York, of counsel, hereby submits its pretrial memorandum of law in accordance with this Court's Pretrial Order.

## I.   SECOND SUPERSEDING INDICTMENT

The Second Superseding Indictment charges the defendants with operating a large-scale drug trafficking organization.   Some of the members operated out of California and shipped drugs to the Western District of New York.   Others operated out of Western New York and received the drugs and/or distributed the drugs throughout this area.   When the drugs were sold, the proceeds would be deposited into bank accounts in Western New York and withdrawn from banking institutions in California.   Some of the proceeds were sent via money orders or wire transfers to California and/or Mexico.   The conspiracy to distribute

narcotics resulted in the transportation and delivery of thousands of kilograms of illegal narcotics, including heroin, fentanyl, and cocaine throughout the United States, including Lockport, Niagara Falls, and Buffalo, New York.   The Second Superseding Indictment charges over $37 Million in drug proceeds and over $19 Million in laundered funds.

Defendants JOSE RUBEN GIL a/k/a Unc a/k/a Ruben GIL Campos a/k/a Mayor of Mexico, and HERMAN E. AGUIRRE a/k/a 007 a/k/a Lucky a/k/a Primo a/k/a Freddy, are leaders of the conspiracy who organized the scheme to ship the narcotics to the Western District of New York and to launder the funds back to California and Mexico.   Both defendants resided in the State of California and operated together out of a warehouse in Montebello, California.   They were both obtaining the drugs from members of the Sinaloa cartel in Mexico and shipping them from California to New York and elsewhere.   They are responsible for recruiting the other members of the conspiracy.

Defendants TROY R. GILLON, RASHAWN CRULE a/k/a Black a/k/a Shawn, and DEMETRIUS YARBOROUGH a/k/a Tu-Tu all resided in Western New York and agreed to receive the drugs which were ultimately sold on the streets of this area.   Defendant GILLON was the link between the California defendants and the Western New York defendants.   He distributed directly to CRULE and YARBOROUGH, who each in turn sold to customers on the street.

The conspiracy ended on or around September 2015 after indictments charging several of the defendants were handed up by a federal grand jury in Western New York.

**THE DEA INVESTIGATION IN WESTERN NEW YORK**

Several months after defendant Troy GILLON was released from prison on a prior drug felony sentence, in November of 2013, a source of information called the Buffalo F.B.I. with information about a large, multi-kilogram drug trafficking organization operated by GILLON in the Buffalo, New York area with a Mexican source of supply. Soon after, a second source of information came forward to the Drug Enforcement Administration (DEA) with information linking defendant Demetrious YARBOROUGH as a major drug distributor for GILLON. Because both GILLON and YARBOROUGH have prior drug felony convictions and because of the scope of the distribution, these two individuals were high priority targets for law enforcement. After conducting additional investigative leads, including using confidential sources and police surveillance, federal agents believed YARBOROUGH was moving kilogram quantities of cocaine in Buffalo. In October of 2013, police executed a search warrant at YARBOROUGH's home located at 22 Carl Street in Buffalo. Among his personal papers, a drug ledger and three (3) kilogram wrappers with cocaine residue were found. One of the wrappers was tested for the presence of narcotics and DNA. A forensic chemist confirmed that cocaine was on the wrapper. A forensic biologist recently confirmed that YARBOROUGH's known profile cannot be excluded from the DNA mixtures obtained on the wrappers. A full report is expected to be issued soon.

As the investigation developed, other confidential sources identified Trent Hamilton and Michael Mitchell as retail level dealers for defendant Troy GILLON in the Lockport and Niagara Falls area. In early 2014, a pole camera was installed outside of 95 North Transit Road in Lockport, New York—a known residence of Trent Hamilton, as well as 184 High

Street in Lockport, New York—a known apartment of Trent Hamilton.  In the summer of 2014, the DEA and the Niagara County Drug Task Force (NCDTF) began making multiple undercover drug buys into Hamilton and Mitchell.  Using a confidential source, law enforcement made buys into Michael Mitchell on September 4, 12, 18, 24 and October 2, 2014, and lab reports confirmed the substances as heroin, cocaine, and cocaine base.  Law enforcement identified 1154 La Salle Avenue in Niagara Falls as Michael Mitchell's residence and confidential sources went to that location to purchase drugs from Mitchell.  On September 17, 2014, the DEA installed a pole camera outside Mitchell's residence.  Now, law enforcement could view GILLON, Mitchell and Hamilton, along with their identified vehicles, at various pole camera locations.

By October of 2014, authorization was sought to intercept wire communications from defendant Michael Mitchell's telephone (TT-1).  The introduction of a wire allowed law enforcement to monitor Mitchell's communications in conjunction with pole camera footage.  Mitchell is captured on innumerable drug-related conversations on the wire, including customers requesting quantities of drugs.  In mid-November of 2014, Trent Hamilton's telephones (TT-2 and TT-3) were intercepted pursuant to a court order.  Mitchell is captured in drug related conversations on the wire and is admonished by Hamilton for speaking recklessly about drugs in the event that law enforcement is listening.

In early 2015, a source of information assisted the DEA by gaining close access to Troy GILLON.  GILLON told this source that pallets of drugs were being shipped in microwaves, and that each microwave contained 1 kilogram of heroin.  These shipments

were sourced by a Mexican supplier based out of California.   GILLON boasted to this source that he brought 1,500 kilograms of drugs into the Buffalo area since he began the trafficking operation in 2013.   A few days later, the source was able to obtain 99 grams of heroin from GILLON.   The substance was tested at the lab and confirmed as heroin, while the inner packaging was swabbed for DNA and later compared, and matched to a buccal swab of GILLON's.   This same source met GILLON at 184 High Street just a few days later on March 4, 2015 and bragged that he could get the source 10 kilograms of "china white" which is the street name for fentanyl.   Around this time, NCDTF obtained a search warrant to install a GPS tracking device on GILLON's vehicle.

In early March of 2015, the DEA and NCDTF obtained federal and state search warrants for Hamilton and Mitchell's residences.   On the evening of March 9, 2015, DEA and HSI agents were notified that GILLON's vehicle crossed a geo fence near the Tulip Molded Plastics Factory in Niagara Falls, New York.   Because agents were in the area, they drove to the factory and saw GILLON in his vehicle, leaving the factory parking lot.   GILLON drove directly to 184 High Street.   As GILLON locked his car, his headlights illuminated his surroundings and agents could see GILLON was holding a bag, which agents believed contained drugs.   The agents got authorization to execute the search warrants in the middle of the night.   Trent Hamilton jumped out of a window at 184 High Street in an attempt to avoid arrest, but he was captured.   Lockport Police stopped GILLON's vehicle and members of the NCDTF asked GILLON whether he would speak with law enforcement.   GILLON agreed and told agents that he was involved in trafficking drugs and could assist police in getting his supplier.

For the next several months, GILLON assisted the DEA by giving law enforcement intelligence on the Mexican sources of supply, who were identified as Jose Ruben GIL and Herman AGUIRRE.   It was at this point that the investigations being conducted in Western New York and the investigations being conducted by the DEA in California and the Department of Homeland Security (Immigration and Customs Enforcement) in Chicago were linked.

## THE HSI INVESTIGATION IN CHICAGO

On September 30, 2011, law enforcement in the Northern District of Illinois make a 33 kilogram seizure of cocaine which was shipped by a Mexican source of supply.   An investigation developed from there and by 2013, the Department of Homeland Security identified a sophisticated money-laundering organization being run by the sources in Mexico. The investigation utilized a confidential source who was being used by the Mexican cartel to receive U.S. currency which represented the proceeds of drug trafficking.   Thereafter, he would arrange the purchase of gold with the proceeds and ship the gold to a refinery in South Florida.   From there, the gold was refined and sold on the market.   The proceeds from the sales were then distributed to banking accounts in Mexico that were managed by cartel.   The investigation culminated in the charging of 38 people and the identification of over $100 Million in laundered funds.

Although he was never charged by the investigation in Chicago, HSI agents documented an event between on or about November 11-13, 2013 when defendant AGUIRRE provided $69,990 in drug proceeds to the cooperating source on behalf of the

cartel.   Agents documented how a Hispanic male contacted the cooperating source by cellphone in the days leading up to the meeting.   Those communications were preserved as evidence and transcripts with translation from Spanish to English were also created.   Then, on November 13, 2013, the Hispanic male was surveilled on video meeting with the cooperating source and delivering a bag containing U.S. currency that was supposed to total $70,000 (the ultimate count showed the deposit to be $10 short).   The Hispanic male was then followed by HSI agents in Chicago until he reached the Wisconsin border.   From there, HSI agents in Milwaukee continued trailing the male to the Best Western Hotel at the Milwaukee airport.   After speaking with hotel staff, the man was positively identified as defendant Herman AGUIRRE.

A federal subpoena issued upon the Best Western revealed that AGUIRRE has been registered as a hotel guest from September 1, 2013 to November 17, 2013.   Surveillance images from the hotel lobby depict the defendant at the front desk during that time period. Subscriber and toll records were also obtained for the number being utilized by AGUIRRE during this operation.

**THE DEA INVESTIGATION IN CALIFORNIA**

In October, 2013, DEA agents in Los Angeles received intelligence from a confidential informant that Jose RUBEN GIL was operating a large-scale drug distribution of kilogram quantities of drugs.   It was reported that RUBEN GIL utilized his tractor trailers from his shipping business to send the drugs across the country.   It was further reported that RUBEN GIL would receive these drugs from Mexican sources.   After surveillance was conducted by

DEA agents, an investigation is launched into the activities of RUBEN GIL.   The investigation reveals a warehouse located at 6865 East Washington Boulevard in Montebello, California as a place of interest.   The agents learned that RUBEN GIL was utilizing that warehouse, and that defendant Herman AGUIRRE was also utilizing that warehouse.

On January 14, 2014, surveillance showed RUBEN GIL and others conducting suspicious activities at the warehouse.   When agents followed a courier from the warehouse, he led them to a United States Post Office.   When he was confronted, the courier admitted to shipping two kilograms of cocaine (each in one package) to addresses that were provided to him.   In his hand, the courier had a piece of paper which contained a fictitious name at a legitimate address in Niagara Falls, NY and Buffalo, NY.   Shortly thereafter, agents raided the Montebello warehouse and recovered five (5) additional kilograms of cocaine in the office utilized by RUBEN GIL.   The defendant RUBEN GIL admitted to possessing the kilograms for distribution to the Western District of New York and elsewhere.   RUBEN GIL was arrested at the warehouse and has remained in custody ever since.   He faced charges in California for this offense and later pled guilty to those charges.   He also admitted to violating the terms of his supervised release before a District Court Judge for the Southern District of New York.

Inside the warehouse was co-defendant Sonia Hernandez, who worked as a secretary to Herman AGUIRRE.   Although she was not charged at that time, she later re-surfaced in the investigation.   Agents in Buffalo received information about eight (8) kilograms being shipped to Buffalo in May, 2014 and records revealed that Sonia Hernandez surrendered a

rental car in Buffalo and flew back to Los Angeles on a one-way flight.   Thereafter, on June 21, 2014, Sonia Hernandez was arrested in Nebraska driving a rental car bound for Buffalo, NY.   Inside, state police officers in Nebraska recovered 18 kilograms of drugs (11 kilograms of cocaine and 7 kilograms of heroin).

## THE DEA INVESTIGATION IN BUFFALO AND THE ARRESTS

On March 24, 2015, a 911 call summoned a Buffalo Police patrol officer to 98 Folger Street in South Buffalo.   While there, police seized 24 kilograms of cocaine and 8 kilograms of fentanyl from a bedroom used by co-defendant Shirley Grigsby.  The investigation revealed that co-defendant Maulana Lucas asked his girlfriend, Grigsby, to store the kilograms there for him.  Police arrested Lucas and Grigsby and discovered that the kilograms seized from Folger Street were shipped from Herman AGUIRRE.  Police also seized the rental car operated by Lucas which contained nearly $100,000 in U.S. currency, which represented drug proceeds that belonged to AGUIRRE.   Lucas had just picked up the proceeds from Baltimore, MD and transported them to Niagara Falls, NY.

This information regarding the large seizure on Folger Street was also confirmed by GILLON, who was still actively assisting the DEA.  Agents learned that after RUBEN GIL's arrest in January, 2014, AGUIRRE continued the narcotics organization, which also involved an intricate money laundering scheme wherein Buffalo conspirators would deposit cash proceeds from drug sales, and AGUIRRE disguised the sales as profits from selling sea cucumber—a highly sought after Asian delicacy in the China and other Pacific Rim nations.

In April of 2015, GILLON ceased cooperating with the DEA.   GILLON and AGUIRRE were arrested in late July 2015 after the initial indictment under 15-CR-143 was handed up by a Federal Grand Jury in the Western District of New York.

Following those arrests, DEA agents continued their investigation into other participants of the conspiracy.   In October, 2015, DEA agents made controlled buys into defendant Rashawn CRULE, who had been receiving his narcotics from this organization. On November 2, 2015, the DEA executed three federal search warrants on CRULE's house and two drug stash houses in Buffalo.   Heroin, fentanyl, cocaine and a gun were seized from one of CRULE's stash houses.   CRULE told agents that he was receiving kilograms of heroin from Troy GILLON and selling it for profit.   CRULE admitted that he received five (5) kilograms of heroin from GILLON just prior to his arrest on July 31, 2015.   CRULE worked at the Park School coaching young girls and also at the Saunders Community Center where he coached basketball to local kids.   Agents learned from witnesses that CRULE would leave the Park School and the Community Center to conduct drug sales to his heroin and fentanyl customers.   The headmaster at the Park School revealed that CRULE was fired due to complaints that he neglected his coaching responsibilities and was constantly communicating with various individuals on his cellphone while working.

CRULE was initially indicted in January of 2016, and then added to the Superseding Indictment, which was issued by the Grand Jury in August of 2016.   YARBOROUGH was apprehended as a fugitive in November, 2016.

## II.   POTENTIAL TRIAL ISSUES

At trial, the government expects that various evidentiary issues may arise.   Some of these issues are delineated below and include the government's motions in limine.

## A.   Admissibility of Court-Authorized Wire Communications

At trial, the government intends to introduce into evidence recordings of certain conversations intercepted pursuant to Title III interception orders as part of this investigation, as well as video surveillance.   Although the government does not anticipate any particular issues to arise as a result of the admission of such evidence, the government, for the convenience of the Court and the parties, will provide a brief overview of the law pertaining to such evidence.

### 1.   Authentication and Admission into Evidence

The government intends to introduce recorded conversations derived from the various court-authorized wiretap interceptions.   These conversations will be offered through the testimony of an agent or agents, who supervised the wiretap operations during this case. These witnesses will testify in detail to the procedures followed to obtain the recordings.   In order to prosecute this case as expeditiously as possible, the government does not intend to present testimony from the individual monitors of each of the conversations that will be offered as evidence.   As set forth below, it is not necessary for the government to authenticate tapes by someone who either participated in or personally overheard the subject matter of the recordings.   See United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977) ("There simply is

no requirement that the tapes be put in evidence through the person wearing the recorder or, for that matter, through a contemporaneous witness to the recorded conversation.").

The testimony of supervising agents to authenticate recorded evidence has been approved as an appropriate substitute for the testimony of the actual monitors or recorders. See, e.g., United States v. Rengifo, 789 F.2d 975, 978 (1st Cir. 1986); United States v. Cortellesso, 633 F.2d 361,364 (1st Cir. 1981); United States v. Fuentes, 563 F.2d 527, 529, 531-33 (2d Cir. 1977); United States v. Barnes, 1996 WL 684391, *3 (D. Conn. 1996).

Indeed, the courts have held that recorded conversations can be authenticated by someone who did not participate in or personally overhear the subject matter of the recording in evidence.   It is sufficient that the testifying witness state that he supervised the activities of the agents actually manning the listening post, and visited the listening post periodically to observe the agents.   The witness also described in detail the custody procedures followed to maintain the integrity of the recordings.   According to the courts, this testimony is sufficient to raise a presumption of official regularity, discharging the government's burden of authentication.   United States v. Rengifo, 789 F.2d 975, supra; United States v. Green, 175 F.3d 822 (10th Cir. 1999); United States v. Millan, 817 F. Supp. 1072 (S.D.N.Y. 1993).

Additionally, in this case, the government expects that in some instances it will call as trial witnesses persons who were participants in the conversations to be introduced.   The testimony of such witnesses will further authenticate the recordings.   See, United States v. Albert, 595 F.2d 283, 290 (5th Cir. 1979)("[The witness] identified the voices on the tape and

stated that the conversation on the tape was the one he had conducted with the drug dealer at the time the recording was made . . . [The witness] was available for cross-examination concerning his identification of the voices and the conversation on the tape.   Any doubts the defendants may have raised about his identification went to the weight and not the admissibility of the tape.").

Finally, all of the recordings which the government will seek to introduce at trial fall in to one of two categories.   The first category consists of recorded conversations to which the defendant was a party and, as such, the conversations were admissions by a party-opponent and not hearsay, pursuant to Fed. R. Evid. 801(d)(2)(a).   United States v. Quintana, 70 F.3d 1167 (10th Cir. 1995).   The second category consists of recorded conversations between the defendant's co-conspirators made in furtherance on the conspiracy and, as such, the conversations are admissible pursuant to Federal Rule of Evidence 801(d)(2)(E), and United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989).

### 2.    Voice Identification

The government expects that witnesses who know, and spoke with, the particular defendant, will make voice identifications of the defendant at trial from intercepted wire communications.   These identifications will be based on their familiarity with the particular defendant's voice.   These witnesses, along with other government witnesses, will also make in-court identifications of the particular defendant.

Rule 901 of the Federal Rules of Evidence provides in pertinent part:

(a)     **General provision.**   The requirement of authentication or I dentification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims

(b)     **Illustrations.**   By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

*   *   *

(c)     **Voice identification.**   Identification of a voice, whether heard firsthand **or** through mechanical or electronic transmission or recording, by opinion based upon <u>hearing the voice at any time</u> under circumstances connecting it with the alleged speaker.

The proposition that only a minimal familiarity with a person's voice is sufficient to support voice identification is illustrated in the Second Circuit's decision in <u>United States v. Albergo</u>, 539 F.2d 860 (2d Cir. 1976).   In <u>Albergo</u>, the Second Court dealt at length with the admissibility of a taped conversation.   In that case, the Court permitted an officer to make a voice identification of the defendant where the officer had listened to the appellant's voice in over 500 taped conversations and had heard the appellant talking at a bar with other individuals.   <u>Id.</u> at 863.   In affirming the admission of this voice identification and the admissibility of intercepted conversations, the Court stated:

> A telephone conversation is admissible in evidence if the identity of the speaker is satisfactorily established, <u>United States v. Biondo</u>, 483 F.2d 635 (8th Cir. 1973), and the question is for the jury if, as reasonable men, they could find the claimed identification to be accurate.   <u>United States v. Alper</u>, 449 F.2d 1223, 1229 (3d Cir. 1971).   Identification may be based upon a subsequent acquaintanceship with the speaker.   <u>United States v. Borrone-Iglar</u>, 468 F.2d 419 (2d Cir. 1972) (per curiam).   Indeed, it may be adequate, although the persons involved have never personally met.   <u>United States v. Chiarizio</u>, 525 F.2d 289 (2d Cir. 1975).   **Impossibility of error is not a prerequisite to the admissibility of evidence.**   <u>United States v. Wilkes</u>, 451 F.2d 938, 939 (2d Cir. 1971); <u>United States v. Easterday</u>, 57 F.2d 165, 167 (2d Cir. 1932).   Where, as

here, the identifying officer had listened to appellant's voice in over 500 taped conversations, his testimony was sufficient to permit the jury, as reasonable men, to identify appellant as the "Philip" who participated in the four conversations at issue.

Moreover, the requirements for voice authentication do not differ markedly from those for document authentication.   Once a prima facie case of authorship is made out by the proponent of the evidence, the testimony is admissible; and the reliability of the identification is for the jury.   Carbo v. United States, 314 F.2d 718, 743 (9th Cir. 1963).

Id. at 863-64.   See also United States v. Armedo-Sarmiento, 545 F.2d 785, 792 (2d Cir. 1976) (finding that the voice identification was a question for the jury); United States v. Santos-Cruz, No. CRIM. 99-505, 2000 WL 326191, *4 (E.D. Pa. Mar. 15, 2000) (finding tapes admissible where officer "listened to every intercepted call and developed and voice identification on each individual intercepted" and also interviewed each defendant following their arrests).

Here, the government's witnesses will identify which of the defendants participated in the intercepted wire communications.   Each of the government's witnesses in this regard are familiar with the respective defendant's voice that they will be identifying.   As such, their identifications are admissible under Rule 901.[1]   See United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001) ("A trial court has broad discretion to determine whether a piece of evidence has been properly authenticated and its ruling will not be reversed absent an abuse of discretion."); United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977) ("[T]his Circuit

---

[1]   Rule 901 "provides a non-exhaustive list of 'examples of authentication or identification conforming with the requirements of this rule.'" United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001) (quoting Fed. R. Evid. 901(a)).

has never expressly adopted a rigid standard for determining the admissibility of tape recordings.").[2]

### 3.    **Audibility**

Although the recordings which the government will introduce at trial are clearly audible, in the unlikely event that the defendant raises the issue, the government observes that the mere fact that portions of a recording are inaudible does not require exclusion of the recording. "Unless the unintelligible portions are so substantial as to render the recordings as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the judge."   United States v. Arango-Correa, 851 F.2d 54 (2d Cir. 1988).

### 4.    **Use of Transcripts**

At trial, the Government intends to introduce transcripts of tape recorded conversations in order to assist the jury in understanding the contents of the recordings.   The Government respectfully submits that it is proper for the jury to review the transcripts while the tapes are being played and to have those transcripts with them when they go to deliberate, provided the Government is able to lay a proper foundation relative to the recordings, voice identification, and accuracy of the transcript.   The Second Circuit has explicitly approved the practice of giving transcripts to the jurors during the trial and during their deliberations as an aid in listening to tape recordings, with an appropriate limiting instruction as to the use of transcripts merely as a listening aid.   In United States v. Koska, 443 F.2d 1167 (2d Cir.), cert.

---

[2]   "Authentication merely renders the tapes admissible, leaving the issue of their ultimate reliability to the jury."   United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001).

denied, 404 U.S. 852 (1971), the Court upheld the use of a transcript being read by the jury while over five hours of tape recordings were played, and later permitted twelve copies of transcript to go to the jury room.

Similarly, in United States v. Carson, 464 F.2d 424 (2d Cir.), cert. denied, 409 U.S. 949 (1972), and subsequent cases, the Circuit Court has repeatedly upheld the practice of giving transcripts to the jurors during the trial and during their deliberations.   See, e.g., United States v. Lam Lek Chong, 544 F.2d 58 (2d Cir. 1976);   United States v. Marin, 513 F.2d 974 (2d Cir. 1975).   The Second Circuit noted with approval the steps taken by the trial judge in United States v. Carson, 464 F.2d at 424, to insure the accuracy of the transcripts. In cases where the defense and prosecution do not agree as to the contents of the tape, the proper procedure is for the jury to receive transcripts of both sides' versions.   Id. 464 F.2d at 437.

It is clear from the cases cited above that transcripts of tape recordings are properly given to the jury when the transcripts are used as an aid in listening to the tapes and are properly given to the jury when deliberations are in progress.   The jury, of course, should be instructed that the transcripts are not conclusive evidence of what is on the tape recordings, and if their hearing differs, it is their decision as triers of the facts to decide what is on the actual tape recordings.   These cautionary instructions, however, in no way mitigate the propriety of the use of the transcripts.

**B.**    **Co-Conspirator Statements**

The government anticipates that questions regarding the admissibility of co-conspirator statements may come up at trial.   Pursuant to Federal Rule of Evidence 801(d)(2)(E), a "statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy" is not hearsay and, therefore, properly admitted against a co-conspirator of the person who made the statement.

> A co-conspirator's statement will be admitted against the accused if the government can show by a preponderance of the evidence "that a conspiracy existed, that both the defendant and the declarant participated in it, that it was in existence at the time the statement was made, and that the statement was made in furtherance of the conspiracy."   [citation omitted]

United States v. Katsougrakis, 715 F.2d 769, 778 (2d Cir. 1983).   The Supreme Court has indicated that statements in furtherance of a conspiracy are non-testimonial for purposes of the Confrontation Clause, and are therefore not covered by its protections.   Crawford v. Washington, 541 U.S. 36, 56 (2004)(noting that most hearsay exceptions "covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy"); id. at 68, (concluding that, unlike testimonial evidence, "nontestimonial hearsay ... [may be] exempted ... from Confrontation Clause scrutiny altogether."); accord United States v. Logan, 419 F.3d 172, 178 (2d Cir.2005) ("In general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial.").


"The standard for independent proof of participation [in the conspiracy] is 'lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury' . . . and the proof may be 'totally circumstantial' [citation omitted]."   United States v. Cicale, 691 F.2d 95, 103 (2d Cir. 1982); United States v. Terry, 702 F.2d 299, 320 (2d Cir. 1983).   "[A]ll that

is required . . . is 'a showing of a likelihood of an illicit association between the declarant and the defendant [citation omitted]." United States v. Cicale, 691 F.2d, at 103; United States v. Terry, 702 F.2d, at 320.   The coconspirator statements may be evaluated by the Court together with all the other evidence in the case in order to determine whether a defendant was a member of the conspiracy.   Bourjaily v. United States, 483 U.S., at 178-81.   See also, F.R.E. 801(d)(2)(E).

The statements of a co-conspirator must have also been made "in furtherance of the conspiracy."  This "phrase must not be applied too strictly or the purpose of the exception [to the rule against hearsay in F.R.E. 801(d)(2)(E)] would be defeated."   United States v. Patton, 594 F.2d 444, 447 (5th Cir. 1979).

> We have held that the term "in furtherance of the conspiracy" implies that "statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example . . . seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy."  [citations omitted].

United States v. Diaz, 176 F.3d 52, 85 (2d Cir. 1999).

"Statements of a conspirator identifying a fellow coconspirator are considered to be made in furtherance of the conspiracy."   United States v. Handy, 668 F.2d 407, 408 (8th Cir. 1982); see also, United States v. Carlson, 547 F.2d 1346, 1361 n.15 (8th Cir. 1976); United States v. Cambindo Valencia, 609 F.2d 603, 632 (2d Cir. 1979).   Statements of a conspirator implicating a co-defendant in a murder committed as part of a drug conspiracy are properly admitted as statements made in furtherance of the conspiracy.   United States v. Diaz, 176 F.3d, at 84-86.   Moreover, statements made as part of an effort to recruit an individual into

the conspiracy are "in furtherance" of the conspiracy because they are intended to achieve the conspiracy's goals. See Glenn v. Bartlett, 98 F.3d 721, 729 (2d Cir.1996), cert. denied, 117 S. Ct. 1116 (1997).   Furthermore, statements regarding the "'current status of the conspiracy'" and "the identity and activities of co-conspirators" are also made in furtherance of the conspiracy.   United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989); see also United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993) (in furtherance of the conspiracy implies that "the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example ... seeking to induce a co-conspirator's assistance, serving to foster trust and cohesiveness, or informing co-conspirators as to the progress or status of the conspiracy.").

Significantly, although a co-conspirator's statement must also have been made "during the course of" the conspiracy, the conspiracy between the declarant and the defendant need not be identical to any conspiracy specifically charged in the Superseding Indictment. United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999); see also United States v. Rutland, 705 F.3d 1238 (10th Cir. 2013) (statements made pursuant to a robbery conspiracy also admissible in drug conspiracy).   Furthermore, "as long as the declarant and the party against whom the statement was offered in Court were members of the same conspiracy at the time the statement was made, any witness may recount it at trial."   See United States v. Mincione, 960 F.2d 1099, 1110 (2d Cir. 1992).

During the course of the trial, the government intends to introduce co-conspirator statements in accordance with the authority set forth above.

C.      **Existence of the Conspiracy**

The proof at trial will clearly show that a conspiracy existed.   A criminal conspiracy is established when the agreement is formed between two or more persons to undertake illegal activity.   See United States v. Torres, 2012 U.S. App. LEXIS 9344, *13-14 (2d Cir. 2010). This conspiracy continues until the conspiracy fails or achieves its objective, or until all members of the conspiracy have withdrawn.   See Krulewitch v. United States, 336 U.S. 440, 442 (1949); see also United States v. Spero, 331 F.3d 57, 60 (2d Cir. 2003).

D.      **Co-Conspirator Liability**

At trial, the government intends to introduce evidence of criminal acts committed by the charged defendants.   This evidence will be used against the defendants to show the existence of the conspiracy, the associations within the conspiracy, and the conspirators' involvement in the conspiracy.   It is well-settled that circumstantial evidence of association among alleged co-conspirators is relevant and admissible in a conspiracy prosecution. "Since agreement is an element of conspiracy, evidence of association is relevant."   United States v. Armone, 363 F.2d 385, 403-04 (2d Cir. 1966).

The law is clear that the acts of a conspirator are admissible against a co-conspirator as long as sufficient evidence of the existence of the conspiracy has been presented.   See, e.g., United States v. Henderson, 446 F.2d 9960, 965 (8th Cir. 1971); United States v. Sepulveda, 710 F.2d 188, 189 (5th Cir. 1983); United States v. Ortiz-Rengifo, 832 F.2d 722, 725 (2d Cir. 1987).   To be admissible against a conspirator, the acts of a co-conspirator do not have to meet the standards for the admission of co-conspirator declarations.   See United States v.

Geany, 417 F.2d 1116, 1120 n.3 (2d Cir. 1969).   In other words, to be admissible against a conspirator, the acts of a co-conspirator must simply be shown to be relevant within the meaning of Federal Rule of Evidence 401, i.e., the acts "ha[ve] a tendency to make the existence of a material fact more probable."   United States v. Ortiz-Rengifo, supra, 832 F.2d at 725.

When a conspiracy has been established, the criminal liability of its members "extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." United States v. Bryser, 954 F.2d 79, 88 (2d Cir. 1992), citing, Pinkerton v. United States, 328 U.S. 640, 646-48 (1946).   As such, it is permissible to argue, and for the jury to be charged, that they may "find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was member of the conspiracy."   United States v. Miley, 513 F.2d 1191, 1208 (2d Cir. 1975).

## E.    Evidence Regarding Background or Formation of the Conspiracy

The government will seek to introduce evidence of drug possession and distribution engaged in by the defendants at various times during the preceding years of the charged conspiracy.   Notwithstanding the fact that the Second Superseding Indictment covers a time-period encompassing over two years, a defendant may contend that certain evidence presented reflects conduct which pre-dates his joining the conspiracy.   Even assuming arguendo the validity of this anticipated contention, it is well-settled that, in a conspiracy prosecution, evidence of conduct that has occurred prior to the time period covered by the

Second Superseding Indictment is admissible for the purpose of showing the defendant's intent, association, purpose and the nature of his plan.   See, e.g., United States v. Cioffi, 493 F.2d 1111, 1115 (2d Cir. 1974); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) (the evidence of prior dealings was properly admitted to explain how the illegal relationship developed and to explain why the defendant was appointed to a leading position in the Organization).; United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990); United States v. Morton, 483 F.2d 573, 575-76 (8th Cir. 1973); United States v. Nelson, 570 F.2d 258, 262 (8th Cir. 1978) (holding that evidence introduced to prove a mail fraud scheme may go back to the period before the scheme was fully formed).   Accordingly, the Court should permit evidence concerning the nature, background, and history of the charged conspiracy, and the defendants' association with one another and other co-conspirators.

## F.    **Evidence Inextricably Intertwined**

While the government submits that virtually all criminal activity presented during trial will fall within the time periods alleged in the Second Superseding Indictment, and is related to, or will be offered to prove the existence of, the conspiracy, the defendants may still attempt to claim that such testimony or evidence is inadmissible because it does not relate to the conspiracy.   Assuming *arguendo* this objection is proffered by the defense, it should be rejected.

At a minimum such evidence will be inextricably intertwined with the charged conspiracies.   As the Second Circuit has observed:

[E]vidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it "arose out of the same transaction or

series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial."

United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983) (citations omitted)).

This is especially true in conspiracy cases where the government alleges that certain acts are committed in furtherance of the conspiracy.   In United States v. Pike, 292 Fed.Appx. 108, 111 (2d Cir. 2008), the Second Circuit affirmed a conviction wherein the Court permitted evidence of uncharged homicides because they were relevant to the charged drug conspiracy. Similarly, in United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997), the Second Circuit found that references that the defendant made about drug deals, loan sharks, and his own probation status during phone messages are not other bad acts meriting exclusion under Federal Rule of Evidence 404(b).   Rather, the Court found that such evidence is the extortionate means by which the defendant attempted to collect on a loan and was therefore inextricably intertwined with the alleged conduct.   See, e.g., United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997); see also United States v. Mauro, 80 F.3d 73 (2d Cir. 1996) (not abuse of discretion for court to permit the government to reveal that defendant was simply in prison, and not the reason for his incarceration); United States v. Vargas, 279 Fed. Appx. 56, 58 (2d Cir. 2008) (prior heroin conviction and incarceration admitted for rebutting defense claim that someone else was leader of the conspiracy); United States v. Pitre, 960 F.2d 1112, 1113 (2d Cir. 1992) (other act evidence may be admitted to help explain illegal relationship and mutual trust between co-conspirators).

Other Circuits have similarly found that evidence that is inextricably intertwined with the evidence used to prove a crime charged is not extrinsic evidence under Rule 404(b).   See United States v. Randall, 887 F.2d 1262, 1268 (5th Cir. 1989).   Such evidence is considered intrinsic and is admissible so that the jury may evaluate all the circumstances under which the defendant acted. Id; see also United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990) (other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged) (citing United States v. Torres, 685 F.2d 921, 924 (5th Cir. 1982)).

Accordingly, evidence of criminal conduct not specified in the Second Superseding Indictment is properly admissible because such evidence establishes, and is inextricably intertwined with, the charged conspiracy.

## G.   Photos of Co-Conspirators Not on Trial

In some instances, cooperating or other witnesses may only know other members or associates of the charged enterprise by nickname.   In the event a witness, or witnesses, does not know true names of other members or associates of the enterprise, the government may introduce photos of co-conspirators who are not presently on trial, as their activities are relevant to the charges and to the defendant presently proceeding to trial.   It is submitted that introduction of such photos is relevant under Rule 401, and not unduly prejudicial under Rule 403.

**H.** **Government's Right to Bring Out Information Damaging to Witnesses Called by the Government on Direct Examination**

It is well-settled that a party is permitted to minimize the impact of an opponent's impeachment by initiating the impeachment. See United States v. Ewings, 936 F.2d 903, 909 (7th Cir. 1991) ("[M]inimizing the 'sting' of an opponent's impeachment by initiating the impeachment yourself is a time-honored trial tactic.") (collecting cases). The government may bring out information damaging to its witnesses' credibility to prevent the defense from creating the impression, or the jurors from thinking, that the government is trying to hide something from the jury. See United States v. Del Purgatorio, 411 F.2d 84, 87 (2d Cir. 1969); see also United States v. Koppers Company, Inc., 652 F.2d 290, 299 (2d Cir. 1981) (prior inconsistent statements); see also United States v. Hasenstab, 575 F.2d 1035, 1040 (2d Cir. 1978) (prior crimes); see also United States v. Livingston, 816 F.2d 184, 191 (5th Cir. 1987) (permitting introduction of impeaching statements in direct testimony).

Here, several of the government's witnesses made statements to law enforcement which may be inconsistent, to varying degrees, with some of their trial testimony. Additionally, some of these witnesses committed prior crimes (some resulting in convictions and some never resulting in arrests) as a part of their conduct in connection with the drug trafficking organization. The government should be permitted to bring out all such information during the direct examination of each witness.

**I.** **Witness Cooperation Agreements**

Certain of the government's trial witnesses have entered into plea/cooperation agreements with the government, which set forth, among other things, their obligations to

cooperate with the government and what will happen should they break the agreements.    The Second Circuit has dealt on numerous occasions with the proper procedure for admission of such agreements.

> Because of the bolstering potential of cooperation agreements, however, we have permitted such agreements to be admitted in their entirety only after the credibility of the witness has been attacked. * * *   This restriction proceeds from our view that "the <u>entire</u> cooperation agreement bolsters more than it impeaches." * * *   Thus, although the prosecutor may inquire into impeaching aspects of the cooperation agreements on direct, bolstering aspects such as promises to testify truthfully or penalties for failure to do so may only be developed to rehabilitate the witness after a defense attack on credibility. [citations and footnote omitted].

<u>United States v. Cosentino</u>, 844 F.2d 30, 33 (2d Cir. 1988).

While admission of the bolstering aspects of a cooperation agreement must usually await cross-examination of the witness, if a sufficient defense attack on the credibility of a government witness takes place in an opening statement, evidence of the bolstering aspects of the agreement may be brought out on direct examination of the witness.    Not only testimony about the agreement but the actual agreement itself may be admitted on direct examination in appropriate cases.   <u>United States v. Cosentino</u>, <u>supra</u>, 844 F.2d, at 33-34.

**J.**    **<u>Hostile Witnesses</u>**

The government will request permission to use leading questions during its direct examination with any hostile witnesses.

Rule 611(c) of the Federal Rules of Evidence provides as follows:

> **(a)**    **Leading questions.**   Leading questions should not be used on the direct examination of a witness except as may be necessary to

> develop his testimony.    Ordinarily, leading questions should be
> permitted on cross-examination.    When a party calls a hostile witness,
> an adverse party, or a <u>witness identified with an adverse party</u>,
> interrogation may be made by leading question.

Under the aforesaid rule, a "witness identified with an adverse party" is considered a hostile witness as a matter of law, and is subject to direct examination by leading questions without any showing of hostility in fact.    See <u>Notes of Committee on the Judiciary</u>, Senate Report No. 93-1277: Note 2, Subdivision (c).    Subdivision (c) of Rule 611 significantly enlarged the class of witnesses presumed hostile and subject to direct examination through leading questions without a showing of actual hostility.    <u>Haney v. Mizell Memorial Hospital</u>, 744 F.2d 1467, 1477-78 (11th Cir. 1984).    A close friend of a defendant has been held to be a witness identified with an adverse party within the meaning of Rule 611(c).    <u>United States v. Hicks</u>, 748 F.2d 854, 859 (4th Cir. 1984); <u>see also</u>, <u>United States v. Brown</u>, 603 F.2d 1022 (1st Cir. 1979).    Clearly, employees of the defendant are witnesses who should be found to be identified with the defendant and subject to the use of leading questions by the government. Similarly, witnesses who are being sued by the defendants, are reluctant to testify and should be declared hostile.

**K.**    <u>**Prior Statements as Substantive Evidence**</u>

Rule 801(d)(1)(A) provides, in pertinent part, as follows:

> (A) Statements which are not hearsay.    A statement is not hearsay if —
>
> (a) Prior statement by witness.    The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (b) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition * * * *

Thus, under this Rule, statements which are inconsistent with the testimony at trial and which were given under oath or in a deposition are admissible as substantive evidence.   Here, the government expects that it may, at trial, seek to introduce such evidence.

Under this Rule, the government may properly introduce a witness's prior grand jury testimony where such testimony is inconsistent with such witness's trial testimony.   See, United States v. Murphy, 696 F.2d 282, 284 (4th Cir. 1982); United States v. Marchand, 564 F.2d 983, 997-999 (2d Cir. 1977) (inconsistent prior grand jury testimony admissible under Rule 801(d)(1)(A)); United States v. Mosley, 555 F.2d 191, 193 (8th Cir. 1977); United States v. Rivera, 513 F.2d 519 (2d Cir. 1975).   Such evidence may also be introduced where the trial witness forgets or cannot recall that about which he or she testified before the grand jury.   See United States v. Owens, 484 U.S. 554, 558-562 (1988); United States v. Milton, 8 F.3d 39, 47 (D.C. Cir. 1994).

Beyond a witness's prior grand jury testimony, a statement admissible under this Rule may also be in the form of a witness's inconsistent statements during a Rule 11 colloquy, see, e.g., United States v. Lopez, 944 F.2d 33, 41 (1st Cir. 1991), or in the form of witness's statements made under oath or penalty of perjury at an immigration proceeding.   See, e.g., United States v. Castro-Ayon, 537 F.2d 1055, 1058 (9th Cir. 1976).   While statements made to law enforcement officers conducting interrogation likely do not fall within the scope of the Rule, see, e.g., United States v. Livingston, 661 F.2d 239 (D.C. Cir. 1981) (sworn statement given to postal inspector investigating robbery); United States v. Ragghianti, 560 F.2d 1376 (9th Cir. 1977) (prior statement obtained by FBI in criminal investigation); Martin v. United

States, 528 F.2d 1157 (4th Cir.1975) (statements made to federal agents investigating firebombing), sworn statements made under such circumstances may unquestionably be used for impeachment purposes.   United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992).

In any event, to be received as substantive evidence under Rule 801(d)(1)(A), the inconsistency between the witness's trial testimony and the former statement need not be in plain terms.   Rather, it is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the facts are different from the testimony of the witness on the stand.   United States v. Barrett, 539 F.2d 244 (1st Cir. 1976).

Finally, the use of such evidence does not violate the Sixth Amendment's Confrontation Clause as California v. Green, 399 U.S. 149, 159-61 (1970), plainly teaches. Under Green, any prior inconsistent statement, sworn or unsworn, may come in as evidence of its content so long as the declarant is on the witness stand at the trial and subject at that time to cross-examination.

## L.   Admissibility of Law Enforcement and Other Expert Witness Testimony

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

The decision to allow an expert witness to testify in within the discretion of the trial judge and will not be reversed on appeal unless there is an abuse of discretion.   United States

v. DeClue, 899 F.2d 1465, 1473 (6th Cir. 1990).   However, it is clear that the expert's testimony must be relevant to some issue in the case and assist the trier of fact.   If the jury can interpret the evidence or draw a conclusion from the evidence, the testimony of an expert is not needed.   United States v. Masat, 896 F.2d 88 (5th Cir. 1990); United States v. Bronston, 658 F.2d 920 (2d Cir. 1981); United States v. Fowler, 932 F.2d 306 (4th Cir. 1991); United States v. Benson, 941 F.2d 598 (7th Cir. 1991), amended 957 F.2d 301 (7th Cir. 1992); United States v. Brodie, 858 F.2d 492, 496 (9th Cir. 1988).

As more fully detailed in its Expert Disclosure, which we submitted, the government intends to call, among others, a Law Enforcement Expert from the ATF to testify regarding the fact that the firearm and ammunition evidence in this case was not manufactured in New York State, or the United States, and therefore travel in interstate and foreign commerce. We will also call a DEA agent who will provide testimony regarding his expertise in wire interceptions.   Finally we will call experts regarding the chemical testing of several items of evidence and DNA analysis.

The Second Circuit has permitted the use of expert testimony by government agents regarding their interpretation of any physical evidence that is properly before the jury. United States v. Roldan Zapata, 916 F.2d 785, 805 (2nd Cir. 1990).   The Second Circuit has also found that, "Under this liberal rule [Rule 702], a qualified expert may generally suggest inferences that should be drawn from the facts, including inferences embracing the ultimate issue in the case."   United States v. Boissoneault, 926 F.2d 230, 232 (2nd Cir. 1991) (internal citations omitted).

**M.**    **Lay Opinion Testimony**

It is anticipated that several witnesses will testify as to their understanding and interpretation of the evidence that they had either heard, saw, or touched.

Rule 701 of the Federal Rules of Evidence, a witness who is not testifying as an expert can testify in the form of opinions or inferences provided such testimony is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge with the scope of Rule 702." Therefore, it is clear that lay witnesses can give opinions as to evidence that they are personally familiar with and that will be helpful to resolving an issue in the case. Under Rule 704 of the Federal Rules of Evidence, this opinion testimony is "not objectionable because it embraces the ultimate issue to be decided by the trier of fact."

For instance, Courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established. See United States v. Westbrook, 896 F.2d 330 (8th Cir. 1990) (two lay witnesses who were heavy amphetamine users were properly permitted to testify that a substance was amphetamine; but was error to permit another witness to make such an identification where she had no experience with amphetamines). Moreover, there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others. See United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992). However, before doing so, the proponent of the testimony must establish a proper foundation. For instance, a participant in a

conversation may testify as to his understanding of the conversation to satisfy Rule 701's requirement that the testimony be rationally based on the witness' perceptions.   See, United States v. Garcia, 291 F.3d 127, 141 (2d Cir. 2002).

In our case, it is expected that witnesses may be called upon to give their opinions as to the meaning of the defendant's words or actions.   The Court should permit the government to elicit such opinion evidence.

**N.**     **Government Demonstrative Exhibits**

In this trial, the government may introduce cell phone records, and may utilize a chart or charts as a demonstrative aid to the jury.   We may also seek to admit charts demonstrating the chronology of relevant dates or travel by the defendants or locations of significant events. We may further attempt to use organizational charts detailing the connections between charged defendants.   These charts will demonstrate or summarize evidence already admitted during the course of the trial.

Allowing the use of charts as "'pedagogical' devices intended to present the government's version of the case" is within the bounds of the trial court's discretion to control the presentation of evidence under Rule 611(a). Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence. See United States v. Taylor, 210 F.3d 311, 315 (5th Cir.2000); see also United States v. Ogba, 526 F.3d 214, 225 (5th Cir. 2008) (organizational chart); see also United States v. Janoti, 374 F.3d 263, 273 (4th Cir. 2004); see also United

<u>States v. Martinez</u>, 1998 WL 613572 *5 (2d Cir. 1998) (demonstrative aid admitted in court's discretion).

**O.      Use of Duplicates**

At trial, the government intends to use duplicate copies of reports.    Under Rule 1003, duplicates are generally admissible as originals in all cases except where there is a genuine issue regarding the authenticity of the original or where admission of the duplicate instead of the original would be unfair.

Under Rule 1004, the original document is not required, and other evidence of the contents of the document is admissible if: 1) the originals are lost or destroyed, 2) the originals are not obtainable, 3) the original is in the control of the opponent, or 4) the document relates to collateral matters not closely related to the controlling issue.    Under any of these circumstances, any type of relevant secondary evidence of the contents of the document is admissible.

In this case, the government intends to utilize copies of several reports of the forensic laboratories involved in this case, as well as law enforcement reports for various purposes including admitting them into evidence, refreshing a witness's recollection, or general rehabilitation.

**P**.   <u>**Defendants' Convictions**</u>

If a defendant elects to testify on his own behalf, then the government intends to impeach the defendant with respect to any prior convictions occurring within the past 10 years of the date of conviction or release from confinement.   <u>See</u> Fed.R.Evid. 609(a)(2) & (b).

Generally, a conviction over ten years old is not admissible.   However, trial courts have discretion to admit such a conviction if the court "determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."   Fed. R. Evid. 609(b).   Under such a circumstance, the court may effectively cure any risk of extreme prejudice to defendant by clearly instructing the jury that evidence of the defendant's prior conviction is admitted solely for the purpose of questioning defendant's credibility and not to show his criminal propensity. <u>See</u> L. Sand, <u>et al.</u>, <u>Modern Federal Jury Instructions</u>, Instruction No. 7-13, Paragraph 7.01, p. 7-52.1.

It should be noted that one defendant, Rashawn CRULE, is charged with being a Felon in Possession of a Firearm.   Therefore, his convictions will be introduced in our case-in-chief unless he chooses to stipulate to being a convicted felon.

**Q.**   <u>**404(b) Evidence and Notice of Intent to Introduce**</u>

In this case, government witnesses will present testimony that the defendants engaged in acts of drug dealing or distribution and money laundering before, during, and after the time period alleged in the Second Superseding Indictment.   Some of the offenses which precede

the indictment, occurred in other jurisdictions or even in Mexico.   The government submits that such evidence relates to the formation of the conspiracy, and is inexplicably intertwined with the charges set forth in the Second Superseding Indictment.   However, in the event the Court disagrees, evidence that the defendants routinely sold drugs and laundered money should nevertheless be admissible pursuant to Federal Rule of Evidence 404(b).   See United States v. Roldan–Zapata, 916 F.2d 795, 804 (2d Cir.1990) (holding that prior act evidence was not unduly prejudicial because, in part, it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").

Even if such testimony is somehow construed as "other act evidence," it is still admissible.   Evidence of other crimes is admissible when: (1) the evidence is relevant to a proper issue, other than the character of the defendant; (2) the evidence is relevant to the material issue in dispute; (3) the evidence's probative value is not substantially outweighed by the prejudicial effect it has on the defendant; and, (4) if requested by the defendant, the court gives proper limiting instructions to the jury preventing the use of the evidence for anything other than the issue it was provided to prove.   See United States v. Alvarez, 541 Fed. Appx. 80, 86 (2d Cir 2013).   The Second Circuit has adopted an inclusionary approach to the other act evidence rule, allowing other act evidence to be admitted for any purpose "other than to demonstrate criminal propensity."   United States v. Laflam, 369 F.3d 153, 156 (2d Cir. 2004); United States v. Schultz, 333 F.3d 393, 415 (2d Cir. 2003) (purposes include, but are not limited to, motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident).   The other act conduct is only required to be similar to the crime for which the defendant is facing where the evidence is being offered to prove intent or

knowledge.   United States v. Araujo, 79 F.3d 7, 8 (2d Cir 1996).   Here, the defendants'
motive, opportunity, intent, preparation, plan, and knowledge regarding the formation of the
drug trafficking organization and the methods by which they did so are material issues in this
case, and are highly relevant and probative regarding the purposes, means, and methods of
the charged offenses.   Accordingly, testimony pertaining to the manner in which the
defendants set-up the organization including the method of obtaining cocaine and heroin,
packaging the drugs, and shipping the drugs, as well as laundering the proceeds, should be
admitted at trial.

**R.**   **Prior Convictions of Government Witnesses**

Some of the governments anticipated trial witnesses have criminal convictions of
varying severity.   This memorandum is submitted in support of the government's position
that some of the witnesses' prior convictions are inadmissible for impeachment purposes.

The impeachment of witnesses with prior convictions is governed by F.R.E. 609.
Pursuant to Rule 609(a)(1), felony convictions not more than 10 years old (calculated from
release from imprisonment) are generally admissible for impeachment purposes.[3]   Pursuant
to Rule 609(a)(2), however, misdemeanor convictions, also not more than ten years old, are
admissible only if they "involved dishonesty or false statement."   Further, pursuant to F.R.E.
609(d), except under limited circumstances, juvenile adjudications are not admissible, United
States v. Canniff, 521 F.2d 565, 569-70 (2d Cir. 1975).

---

[3]   The ten-year limitation is set forth in F.R.E. 609(b).   This time period is measured as of the
date the witness testifies.   United States v. Brown, 409 F. Supp. 890, 894 (W.D.N.Y. 1976).

Misdemeanor convictions are usable for impeachment purposes only if they "bear directly on the likelihood that the [witness] will testify truthfully."   United States v. Hayes, 553 F.2d 824, 827 (2d Cir. 1977).   Such convictions must be in the nature of "'perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense * * *' [citation omitted]" to be admissible for impeachment purposes.   United States v. Hayes, supra, 553 F.2d, at 827.

Misdemeanor convictions for such things as petite larceny and assault, United States v. Hayes, 553 F.2d, at 827; United States v. Fearwell, 595 F.2d 771, 776-77 (D.C. Cir. 1978), possession of narcotics, United States v. Millings, 535 F.2d 121, 123 (D.C. Cir. 1976), prostitution, United States v. Mansaw, 714 F.2d 785, 789 (9th Cir. 1983), and traffic violations, Gordon v. United States, 383 F.2d 936, 940 (D.C. Cir. 1967), however, are not admissible.

## S.   Use of Digitized Evidence and Visual Aids

The government intends, to the extent possible, to display its evidence using the monitors that are already in place in the courtroom.   The government also intends to display audio evidence during the course of the trial.   In order to facilitate matters during the trial, a paralegal or other employee of the U.S. Attorney's Office may be operating the computer program that displays the various exhibits on the computer screens.   Until the items are admitted into evidence, the images will be displayed only on the screens facing the Court,

defense counsel, the government, and the witness.   Only when admitted into evidence will the government request that the items be published to the jury.

**T.      Witness Sequestration**

The government requests pursuant to Rule 615 of the Fed. R. of Evid. that the Court order that witnesses be excluded from the courtroom so that they will not hear the testimony of other witnesses.   We also ask, pursuant to Rule 615(b), that DEA Special Agent (SA) Shane Nastoff be exempted from the sequestration order, and that he be permitted to sit at counsel table as the government's duly-designated representative, even though SA Nastoff may be called during the course of the government's case solely on the issues of authenticating certain electronic evidence as it relates to intercepted wire communications and admission made by some of the defendants.

Sequestration of witnesses is to be virtually automatic unless they fit within one of the exemptions in Rule 615.   United States v. Jackson, 60 F.2d 128, 135 (2nd Cir. 1995).   If there is opposition to the order to exclude a witness from the courtroom, the party opposing it bears the burden to demonstrate why an exemption to exclusion applies, and the party seeking exclusion is to be given an opportunity to demonstrate that it is appropriate.   Id. at 135-37; see also generally, U.S. v. Rivera, 971 F.2d 876, 889-90 (2nd Cir. 1992).   The government does not anticipate that the defendants will oppose a sequestration order.

**U.      Jury Instructions**

The government will be submitting proposed jury instructions which are based on the proposed charges in L. Sand, et al., Modern Federal Jury Instructions (2015).   As the proof develops during trial, it may be necessary to request some additional instructions or changes to the government's proposed instructions.

## V.   Rebuttal Evidence

At this time, the government cannot foresee, but would reserve the right to introduce, rebuttal evidence at trial.   Generally, rebuttal evidence may be introduced to refute evidence on material issues of fact, whether elicited under direct or cross-examination, as well as to refute evidence on collateral issues of fact elicited on direct examination.   See United States v. Newman, 481 F.2d 222, 224 (2d Cir. 1973).   If rebuttal evidence is introduced, it would not be collateral to the main issue of guilt or innocence, nor would it be as a result of issues first drawn out by the government.   See United States v. Boatner, 478 F.2d 737, 743 (2d Cir. 1973).

## W.   Rebuttal Argument

The government hereby reserves its right, pursuant to Rule 29.1 of the Federal Rules of Criminal Procedure, to rebut the defendant's summations.

## X.   Admissibility of Photo Arrays

A prior identification is admissible under Fed.R.Evid. 801(d)(1)(C), regardless of whether the witness confirms the identification in-court.   See United States v. Salameh, 152 F.3d 88, 125 (2d Cir. 1998) (citations omitted); see also United States v. Bautista, 23 F.3d

726, 729 (2d Cir. 1994) (permitted trial testimony about previous identifications, including photo arrays).   A prior identification will be excluded only if the procedure that produced the identification is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law."   Id.   A different or equivocal identification is a matter of weight, not admissibility.   See United States v. Thai, 29 F.3d 785, 810 (2d Cir. 1984); see also United States v. Hudson, 564 F.2d 1377, 1379 (9th Cir. 1977) ("[T]hough a prior identification may be equivocal, the jury is entitled to give it such weight as it will after hearing the testimony under direct and cross examination. Rule 801(d)(1)(C) governs admissibility, not sufficiency…").   Accordingly, upon proper foundation, any photo array identifications should be admitted during the government's case-in-chief.

**Y.**     **Other Issues**

The government hereby request to reserve its right to submit supplemental memorandum to the Court on evidentiary issues should the need arise after the filing of this pre-trial brief.   This request is based on the fact that prior to trial there may be addition evidentiary issues that the Court should be made aware.

**III.     GOVERNMENT MOTIONS IN LIMINE**

The government hereby requests specific pre-trial rulings set forth infra, and reserves its right to file additional motions in limine, or to request the Court to make evidentiary rulings consistent with the arguments and legal authority set forth supra at Section III.

**1.     Government Motion to Restrict Use of 3rd Party's Statements to Impeach**

It is anticipated that, at trial, the defense will attempt to impeach cooperating and other witnesses with the use of statements contained in the notes or investigative report(s) of law enforcement agents.   The government anticipates objecting to this procedure unless proper foundation is established, and requests a pre-trial ruling precluding defendants from attempting to employ such improper impeachment techniques before the jury.

The Federal Rules of Evidence allow the introduction of a prior inconsistent statement to impeach a witness's testimony.     However, a third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization.   United States v. Leonardi, 623 F.2d 746, 757 (2d Cir.), cert. denied 447 U.S. 928, (1980).   Thus, in the absence of endorsement by the witness, a third party's notes or report (such as an FBI 302 or similar law enforcement report) of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words.   If the third party's notes only reflect the note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.   See United States v. Almonte, 956 F.2d 27 (2d Cir. 1992).   The burden of proving that notes reflect the witness's own words rather than the note-taker's characterization falls on the party seeking to introduce the notes. Id.

Application of these rules of evidence will not prevent the defense from otherwise attempting to impeach the witness.   Instead, they assure fair and fundamental process to both sides.   Restrictions on a defendant's presentation of evidence are constitutional if they serve

legitimate interests in the criminal trial process, and are not arbitrary or disproportionate to the purposes they are designed to serve.   See Chambers v. Mississippi, 410 U.S. 284, 294 (1973); see also Taylor v. Illinois, 484 U.S. 400, 414-16 (1988).

2.      **Motion to Preclude Speaking Objections to Admission of Conspiracy Evidence**

Past trial practice reveals that some defense counsel utilize an apparent strategy of utilizing speaking objections to transmit improper legal instructions to the jury, and disrupting the government's presentation of evidence.   While the government does not anticipate that counsel in this case will implement such an improper strategy, in an abundance of caution the government hereby moves to preclude defense counsel from making improper arguments to the jury under the guise of a speaking evidentiary objection.

As set forth above, the law is clear that the acts of a conspirator are admissible against a co-conspirator as long as sufficient evidence of the existence of the conspiracy has been presented.   See United States v. Henderson, 446 F.2d 9960, 965 (8th Cir. 1971); see also United States v. Sepulveda, 710 F.2d 188, 189 (5th Cir. 1983); see also United States v. Ortiz-Rengifo, 832 F.2d 722, 725 (2d Cir. 1987).   Accordingly, once sufficient evidence of a conspiracy has been presented, a speaking objection by defense counsel that an item of evidence relevant to the conspiracy should be inadmissible because "it is not relevant to my client," is improper legal argument proffered to the jury under the guise of an evidentiary objection.   Such speaking objections should be precluded by this Court.

3.      **Limits on Cross-Examination**

Although the government cannot accurately predict the cross-examination anticipated by defense counsel, past trial practice reveals that, often times, defense counsel engages in improper cross-examination.   If that becomes the case, then the government anticipates objecting and asking the Court to limit the extent of, or the scope of such cross-examination. The Confrontation Clause of the Sixth Amendment guarantees the defendant in a criminal prosecution the right to confront witnesses against him. This "'means more than being allowed to confront the witness physically,' for '[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." United States v. Maldonado-Rivera, 922 F.2d 934, 955 (2d Cir.1990) (citations omitted).

However, the Confrontation Clause does not deprive the court of all discretion in setting limits on cross-examination.   It is well-established that the Court has broad discretion to limit the scope of cross-examination. United States v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir.1979) (citing United States v. Green, 523 F.2d 229, 237 (2d Cir.1975)). "[T]he trial judge has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, ... interrogation that is repetitive or only marginally relevant." ' United States v. Maldonado-Rivera, 922 F.2d at 956 (quoting, Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)); see also, United States v. Rahme, 813 F.2d 31, 37 (2d Cir.1987) (scope and extent of cross-examination are within sound discretion of trial court); United States v. Pedroza, 750 F.2d 187, 195 (2d Cir.1984).

4.     **Motion to Preclude Speculative or Hearsay Evidence**

The accused has a right to defend themselves from accusations made against them, but such right is not unlimited in that "trial judges [may] exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. South Carolina, 547 U.S. 319, 326 (2006); see, e.g., Fed. R. Evid. 403. Evidence that another person committed the crime at issue may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial. Id. at 327; see also United States v. Kornhauser, 519 Fed.Appx. 41, 43 (2d Cir. 2013). The "accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410, (1988).

Generally, third-party culpability accusations arise from hearsay statements. Hearsay statements are not allowed into evidence, unless they fall within one of the exceptions to hearsay. Fed. R. Evid. 801-807. Conclusory statements that do not establish a nexus between the accused third-party and the crime, and rely on circumstantial evidence to accuse a third-party do not fall within an exception to hearsay. See Vesey v. McQuiggin 2012 WL 6725888 *8, 13 (E.D.Mich. 2012) (The trial court excluded proffered testimony regarding third party culpability because it did not fall within any exception to hearsay.); see also Jackson v. California, 2013 WL 6709949 *2 (C.D.Cal. 2013) (the court properly excluded evidence of third-party culpability based on hearsay, witnesses' lack of personal knowledge, and no direct evidence linking the third-party to the crime.).

Here, the Court should not permit the defense to introduce hearsay or other speculative and incompetent evidence that other persons committed the crimes charged in the Second Superseding Indictment.

5.  **Motion to Preclude Cross-Examination Pertaining to the Location and Type of Body Recorder Utilized by the Confidential Human Source During Controlled Evidence Purchases**

A confidential human source ("CHS"), operating under the direction and supervision of the DEA or HSI, made controlled evidence purchases of drugs from members of the conspiracy.   During each controlled evidence purchase, the CHS was equipped with a recording device and a transmitter.   The government intends to introduce the recordings of each controlled evidence purchase through the DEA agents who supervised the controlled evidence purchases.

To the extent the defendant, through counsel, attempts to cross examine the DEA agents about the precise location and manner in which the transmitter and body recorder were concealed on the CHS, such cross-examination should be precluded.   The precise location of the recording device, or more specifically, the manner in which the DEA concealed the device, is irrelevant under Rule 401 and risks confusion of the issues for the jury under Rule 403.   Additionally, the government has a qualified privilege not to disclose sensitive investigative techniques, and these techniques should not be disclosed through cross-examination or otherwise.   This privilege can be overcome if the defendant can show an authentic and sufficient need for the information that outweighs the government's privilege. See United States v. Angiulo, 847 F.2d 956, 982 (1st Cir. 1988); United States v. Cintolo, 818

F.2d 980, 1002-1003 (1st Cir. 1987); <u>United States v. Van Horn</u>, 789 F.2d 1492, 1508 (11th Cir. 1986) (holding that disclosure of precise locations where electronic surveillance devices are hidden, or their precise specifications will educate criminals regarding how to protect themselves against police surveillance); <u>United States v. O'Neill</u>, 52 F.Supp.2d 954, 964 (E.D. Wis. 1999).

Here, the Court and the parties will have (1) the recordings; (2) testimony from the DEA or HSI Agent that the CHS was equipped with a body recorder and transmitter, which were in proper working order; (3) testimony from the Agent regarding the circumstances of the controlled evidence purchases, including the agent's instructions to the CHS pertaining to the controlled evidence purchases and; (4) transcripts of the pertinent portions of the recordings.   Because the defense will have more than enough information to conduct a cross-examination, and to mount a defense, there is not a specific and authentic need for the defense to inquire about, or learn the precise location where the body recorder and transmitter were located, or the precise technology utilized during the controlled evidence purchases. Accordingly, information pertaining to specific law enforcement techniques and equipment should remain privileged information.

**6.**     **<u>The Identity of some of the Confidential Human Sources should not be Disclosed During Trial</u>**

The government's privilege extends to withholding the identity of persons who furnish information to law enforcement.   <u>Roviaro v. United States</u>, 353 U.S. 53, 59 (1957). Here, the evidence of controlled evidence purchases made by some of the confidential human sources

will be introduced through the testimony of the law enforcement agents supervising the purchases, through the recordings of the purchases, and through the admissions of the defendants.   Accordingly, in balancing the government's interests against the defendants, there is no compelling or legitimate reason for the defense counsel to ask during cross-examination, or for the Court to compel disclosure of the name of the confidential human source.   The government will provide all impeachment material relating to the confidential human source in redacted format for those sources which are not being utilized.   For example, the source who accepted a money deposit from defendant AGUIRRE in Chicago, Illinois will not be called by the government at the trial or disclosed during the trial.

Based on the foregoing, any in-trial attempts by the defense to ascertain, or reveal, the identity of an informant will be met with objections from the government, and the government respectfully submits that the Court should preclude the defense from attempting to elicit identifying information through cross-examination of government agents.

## IV.   ALIBI DEMAND

Pursuant to Rule 12.1 of the Federal Rules of Criminal Procedure, the government hereby requests that each defendant notify the government of any intended alibi defense.

DATED:   Buffalo, New York, September 24, 2018.


JAMES P. KENNEDY, JR.
United States Attorney


BY:   s/MEGHAN A. TOKASH
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York   14202
716/843-5860
Meghan.Tokash@usdoj.gov

s/MICHAEL P. FELICETTA
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York   14202
716/843-5893
Michael.Felicetta@usdoj.gov